# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**UNITED STATES OF AMERICA**          **CASE NO. 6:18-MJ-00010**
                                                             **6:18-CR-00035-01**

**VERSUS**                                          **JUDGE DRELL**

**MARIUS ANDREI PORUMB (01)**          **MAGISTRATE JUDGE HANNA**


## MEMORANDUM RULING

Before the Court is the Government's Motion Requesting Extradition Certification. (Rec. Doc. 11). Defendant, Marius Andrei Porumb, opposes the Motion (Rec. Doc. 32), and the Government has replied (Rec. Doc. 37). For the following reasons, the Motion is DENIED.

## Factual and Procedural History

Marius Porumb has been an established resident of the United States since this country granted him asylum status from his native country of Romania in 2002. Since that time, he has led a respectable life, first in the construction industry and more recently as a business owner, running a mechanic shop in Lafayette, La. He has raised two daughters here with his long-time partner. He owns property, employs people, and has no criminal history in the United States. (Rec. Doc. 18, at 27-72).

Mr. Porumb is a native Roma—or Gypsy—who, like other Romas, suffered discrimination and persecution in Romania. His history in his home country and the

disturbing facts leading to his grant of asylum were well-documented in his asylum proceedings. (Rec. Doc. 32-1). Particularly relevant to these proceedings are Mr. Porumb's own predictions in 2002 about the future actions he anticipated by the Romanian government. In his 2002 Declaration in Support of Application for Asylum, Mr. Porumb detailed ongoing encounters with Romanian law enforcement wherein they routinely falsely accused him of theft and attempted to elicit bribes from him because he was a Gypsy who had managed to become successful. Mr. Porumb explained that in 2000, the police threatened to "get [him]" on multiple occasions. He was "terrified that the policemen were going to accuse [him] in a false case and detain [him]," and he "was afraid that the police would eventually stay true to their word and accuse [him] in a false case." (Rec. Doc. 32-1, at 13-14). Based on his detailed account of the discrimination and persecution he had undergone throughout his life and his fear that the Romanian government would falsely prosecute him, the United States granted him asylum on September 23, 2002. (Rec. Doc. 32-5).

On June 23, 2003, over a year and a half after Mr. Porumb had come to the United States, the Romanian Government charged him with "using false documents," "swindle," and "indirect participation to forged documents." The charges arose from Mr. Porumb's alleged unauthorized use of his then-wife's separate property (referred to herein as "Apartment 4") as collateral for a loan in

2000. (Rec. Doc. 1-2, at 9-10). In 2005, Mr. Porumb was tried *in absentia*, convicted, and, after the appeal process, sentenced to serve 1 year for using false documents, 4 years for "swindle," and 1 year for indirect participation to forged documents. The Romanian court cumulated the sentences, ordering Mr. Porumb to serve a 4 year term of imprisonment. (Rec. Doc. 1-2, at 1-2).[1]

The Romanian Government did not first seek to extradite Mr. Porumb until December 2, 2011, over five years after the conviction became final. The U.S. Government received Romania's request on February 21, 2012. (Rec. Doc. 32-6). Over the next several years, Romania provided additional information in support of its extradition request, including statements of Mr. Porumb's ex-wife, Liliana Porumb, and the party who allegedly loaned Mr. Porumb money, Petru Rusu, a copy of a notarized document between Mr. Porumb and Liliana's mother regarding Liliana's purchase of the apartment, an identification report, a copy of the June 23, 2003 indictment, and copies of applicable Romanian laws. (Rec. Doc. 1-2, at 51-135). The Romanian Government did not provide a copy of the power of attorney or loan agreement upon which it claims Mr. Porumb forged Liliana's signature and upon which its claims chiefly rest. Neither did it provide a copy of the technical

---

[1]     Mr. Porumb was initially sentenced on May 30, 2005. The sentence was amended on appeal on October 11, 2005. (Rec. Doc. 1-2, at 22-49).

reports whereby the police purportedly matched Mr. Porumb's handwriting to the forged document, or transcripts of the various witnesses' testimony at trial.

The Government did not file the Complaint seeking a warrant for Mr. Porumb's arrest until January 25, 2018, nearly six years after receipt of Romania's initial request for extradition. (Rec. Doc. 1). The Government subsequently filed a Memorandum of Extradition Law and Request for Detention Pending Extradition Proceedings (Rec. Doc. 4) and a Motion Requesting Extradition Certification. (Rec. Doc. 11). This Court conducted a detention hearing on February 6, 2018. (Rec. Doc. 18). After testimony from several of Mr. Porumb's friends regarding his establishment in the Lafayette community, the Court ordered that Mr. Porumb be released on an unsecured bond pending certification of extradition. (Rec. Doc. 17; Report and Recommendation affirmed at Rec. Doc. 29). Mr. Porumb opposed the Government's Motion Requesting Extradition, (Rec. Doc. 32), and the Government replied (Rec. Doc. 37).

## Applicable Law

When the United States has entered into a treaty for extradition with a foreign country, this Court is empowered by 18 U.S.C. §3184 and W.D. La. Local Rule 73.4K to certify to the Secretary of State whether an individual is extraditable. In its determination, the Court must consider the evidence of a crime charged against a person in the United States by the foreign government and determine whether the

4

evidence is sufficient to sustain the charge under the provisions of the applicable treaty. The magistrate judge's determination is limited to the questions of 1) whether the court has jurisdiction; 2) whether the offense charged is within the treaty; and 3) "whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Escobedo v. United States*, 623 F.2d 1098, 1101 (5th Cir.1980), citing *Fernandez v. Phillips*, 268 U.S. 311 (1925).

Intrinsic in the Court's unique role in extradition proceedings is the obligation to determine whether the extradition would violate the individual's constitutional rights or established federal law. See discussion in *Mironescu v. Costner*, 480 F.3d 664, 672–73 (4th Cir. 2007) ("*Mironescu IV*"). Thus, and because the Court is uniquely qualified to interpret and apply the law, it cannot permit an illegal extradition to proceed. As will be further explained, the Court appreciates no valid reason that it cannot make the legality determination in certification proceedings under §3184, just as it can in subsequent *habeas corpus* proceedings, without having subjected the individual to detention and the costs of extended legal proceedings, all to obtain the same end which can be properly had at the beginning. The Court will first address the legality of Mr. Porumb's proposed extradition under 8 U.S.C. §1158(c)(1), and, second, the issues of jurisdiction, criminality, and probable cause.

# I. **Whether Mr. Porumb's proposed extradition would violate federal law.**

## A. **The Court's jurisdiction to determine legality.**

The Government urges the Court to restrict its determination in these certification proceedings to the questions of jurisdiction, criminality under the Treaty, and the existence of probable cause. Although the Court's role is typically limited to these three inquiries, the Court is not aware of any binding precedent which precludes the Court from determining whether the extradition would violate the individual's constitutional rights or established federal law. To the contrary, the Court is obligated to enjoin an extradition when the detention is determined to be unlawful. *Mironescu IV,* 480 F.3d at 670, citing *Plaster v. United States,* 720 F.2d 340, 347-51 (4th Cir.1983).

The Government relies heavily on the *Mironescu* case for the proposition that the Court cannot consider Mr. Porumb's asylant status in certification proceedings; however, careful analysis of the history of *Mironescu* and the Fourth Circuit's opinion actually support that this Court has jurisdiction to preliminarily determine the legality of extradition, in addition to the three primary inquiries of jurisdiction, criminality, and probable cause.

Much like the instant proceedings, the procedural saga of *Mironescu* began when the Romanian Government requested extradition of Petru Mironescu, a Gypsy leader, to serve a sentence after he was convicted *in absentia* of alleged theft crimes.

*In re Extradition of Mironescu*, 296 F.Supp.2d 632 (M.D.N.C.2003) ("*Mironescu I*"). During the initial certification proceedings, Mironescu challenged his extradition on the grounds that his extradition would violate the United Nations Convention Against Torture (CAT), as implemented in the United States by the Foreign Affairs Reform and Restructuring Act (FARR). CAT and FARR prohibit the United States from extraditing "any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture…"[2] Mironescu argued that if he was returned to Romania, he would be subject to torture. The district court found that it did not have jurisdiction "to consider human rights conditions of the country requesting extradition," and certified the extradition. *Id*. at 635-37.

In the next chapter of *Mironescu*, after the district court certified the extradition, but before the Secretary of State made a determination under CAT/FARR, Mironescu filed a petition for habeas corpus, again challenging his detention pending extradition based on CAT/FARR. *Mironescu v. Costner*, 345 F.Supp.2d 538, (M.D.N.C.2004). ("*Mironescu II*"). The court denied the petition, finding that the issue was premature, as the Secretary State was first compelled to determine the likelihood of torture, as required by CAT/FARR, and notify

---

[2]    See discussion in *Mironsecu IV*, 480 F.3d at 666-67.

Mironescu of its determination, at which point he could then seek habeas relief. *Id.* at 541. As further discussed below, this is the opinion on which the Government relies for the proposition that asylum status cannot be considered in extradition proceedings.

Following *Mironescu II*, the Secretary of State determined that CAT did not bar Mironescu's extradition, and Mironescu filed a second habeas corpus petition. The district court remanded the case for preparation of an administrative record, finding that Mironescu's remedy was limited to an administrative review of whether the Secretary's determination was arbitrary and capricious. *Mironescu v. Rice*, 2006 WL 167981 (M.D.N.C.2006) ("*Mironescu III*").

The Fourth Circuit overturned *Mironescu III*, holding that the court was obligated to determine whether extradition would violate Mironescu's constitutional rights or violate federal law. The Government argued, as it does here, that the rule of non-inquiry prevents the courts "from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely." *Mironescu IV*, at 668, citing *Lopez-Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir.1997). The Fourth Circuit rejected the Government's non-inquiry argument—the same argument the Government asserts here— reasoning:

> [T]he Government maintains that regardless of the fact that the
> Secretary's extradition of Mironescu would violate federal law if

extradition will likely result in Mironescu's torture, the rule of non-inquiry should preclude habeas review here because courts are ill-equipped to "second-guess[ ] the expert opinion of the State Department" regarding whether torture is likely to occur in Romania. We do not agree. It is important to emphasize that a habeas court reviewing CAT or FARR Act claims would not be called upon to consider whether extradition would further our foreign policy interests or, if so, how much to weigh those interests. Rather, it would be required to answer only the straightforward question of whether a fugitive would likely face torture in the requesting country. **American courts routinely answer similar questions, including in asylum proceedings and in applying the political offense exception, under which the political nature of and motivation for a crime may negate extraditability….We have no reason to doubt that district courts could adequately perform this function in this context as well.**

*Mironescu, IV*, 480 F.3d at 672–73. (Emphasis added.)

In addition to rejecting the Government's non-inquiry arguments, the Fourth Circuit also rejected the Government's argument that delays caused by habeas review could trigger concerns regarding international comity.

That habeas review may delay extradition, or preclude it altogether, cannot negate Mironescu's right to obtain habeas relief if he is being detained in violation of federal law, just as such considerations did not negate Plaster's right to assert his constitutional claim. *See Plaster,* 720 F.2d at 349. Indeed, *Plaster* specifically recognized that habeas proceedings regarding claims that extradition would be unconstitutional "will often involve delicate questions of international diplomacy." *Id.* Moreover, one could well argue that the damage done to our foreign relations with another country is likely to be less when a court, as opposed to the Secretary, makes the decision that extradition must be denied.

*Id*. at 673.

The court nevertheless went on to hold that Mironescu was not entitled to habeas review based specifically on Section 2242(d) of the FARR, which precluded judicial review for CAT claims until raised after issuance of a final removal order under 8 U.S.C. §1252. The latter part of the opinion, grounded in procedure, is inapplicable to this case, because the basis for illegality of Mr. Porumb's extradition is not CAT/FARR, but, rather, §1158(c), which does not contain any such provision limiting judicial review. The Supreme Court denied the petition for writ of certiorari. *Mironescu v. Costner*, 552 U.S. 1135 (2008). In short, the Fourth Circuit in *Mironescu IV* affirmatively held that, despite the rule of non-inquiry, the judiciary has jurisdiction to consider the legality of an extradition, in addition to the typical inquiries of jurisdiction, criminality under the Treaty, and probable case. This Court agrees.

The Court does not purport to delve into the propriety or constitutionality of Romania's laws and procedures. Rather, the Court finds that it is permitted to determine whether the extradition would violate the laws of the United States. Interpretation and application of United States laws are tasks constitutionally delegated to the judiciary. *Patchak v. Zinke*, 138 S. Ct. 897, 904 (2018), citing *Massachusetts v. Mellon,* 262 U.S. 447, 488 (1923).

Neither does the Court attempt to second-guess decisions of the Executive Branch, as the Government argues, relying on *Munaf v. Geren*, which is factually

and legally distinguishable. *Munaf v. Geren*, 553 U.S. 674 (2008). Munaf and Omar were American citizens who voluntarily travelled to Iraq and committed crimes there. After they were detained by a multi-national task force, they sought, not mere release, but "shelter" from the Iraqi justice system by filing habeas petitions. *Id*. at 694. In rejecting their claims, the Court relied largely on the particular facts of that case, where U.S. citizens voluntarily travelled to Iraq and committed crimes there, noting a sovereign's right to prosecute individuals for crimes committed on its soil. *Id*. Further driving the *Munaf* decision was the Court's recognition of its traditional reluctance to intrude on the Executive Branch's authority in military and national security affairs, neither of which is an issue in this case. *Id*. at 689. Finally, the Court specifically distinguished the underlying concerns in that case from those of extradition cases. *Id*. at 704. In holding that Mr. Porumb's extradition would violate federal law, this Court does not attempt to step into the Executive Branch's role. Determination of legality is a uniquely judicial task.

No known precedent limits the Court's review of extradition legality to post-certification proceedings, such as habeas corpus. Indeed, a contrary holding would raise serious constitutional concerns. If a defendant is detained after a court's certification determination limited only to the three primary inquiries of jurisdiction, criminality, and due process, without a preliminary determination as to whether extradition would violate federal law, the defendant could be deprived of his liberty

until a later, post-certification finding that the extradition violates federal law. Accordingly, the Court finds that it must undertake a legality determination at this stage of the proceedings.

**B. Whether federal law permits extradition of an asylant.**

Having found jurisdiction, the Court next addresses whether Mr. Porumb's extradition would violate federal law. The analysis begins with the 1951 Refugee Convention, a United Nations multi-lateral treaty. Article 33 states in pertinent part:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

> Done at New York Jan. 31, 1967; T.I.A.S. No. 6577 (Nov. 1, 1968).

The Third Circuit explained the United States' historical involvement with the 1951 Convention as follows:

> The United States is a signatory to the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol"), which incorporated the 1951 Convention. The Attorney General implemented regulations to comply with its terms. In 1980, Congress amended the INA through passing the Refugee Act, which brought the domestic laws of the United States into conformity with its treaty obligations under the 1967 Protocol. The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.

> *Al-Fara v. Gonzales*, 404 F.3d 733, 742–43 (3d Cir. 2005) (citations omitted), cited with approval by *Majd v. Gonzales*, 446 F.3d 590, 597 (5th Cir. 2006).

The Refugee Act is found at 8 U.S.C. §1101 *et seq*. 8 U.S.C. §1158 sets forth the procedure for an individual to obtain asylum status. Congruent with the United States' obligation to abstain from refouler under the 1967 Protocol, 8 U.S.C. §1158(c)(1)(A) states:

> In the case of an alien granted asylum under subsection (b), the Attorney General shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence[.]

Unlike other provisions (including §2242 of the FARR, which *Mironescu* analyzed, and the political offense exceptions contained in many treaties), §1158(c)(1)(A) does not contain any exceptions, limitations, or room for discretion by the Attorney General.[3] §1158(c) is absolute in its mandate that aslyants shall not be returned to their country of nationality. Extradition is a return of an individual to his country of nationality. Hence, to extradite one who has been granted asylum back to his native country is to violate a federal statute and the 1967 Protocol and to render the extradition illegal. This Court will not certify an illegal extradition.

The Court's holding that asylum status under §1158(c) precludes extradition is not contrary to any binding precedent. The only *Mironescu* opinion to discuss

---

[3]  Contrast also 8 U.S.C.A. § 1231(b)(3), which provides the Attorney General with discretionary authority to determine whether an alien's life or freedom would be threatened in a particular country due to his race, religion, nationality, or membership in a social or political group. The Attorney General may not remove an alien to such a country.

extradition in light of §1158(c), *Mironescu II* (upon which the Government relies), was implicitly overruled by the Fourth Circuit in *Mironescu IV* insofar as that court found it had jurisdiction to determine whether the extradition would violate federal law. Further, the magistrate judge's commentary in *Mironescu II* regarding §1158(c) is not supported by any jurisprudence and was not discussed or adopted by its own reviewing court. In *Mironescu II*, Mironescu argued that the Romanian Extradition Treaty did not apply to him, because he was protected by §1158(c). In disregarding the mandatory language of the non-refouler provision, the magistrate judge did not cite any law or jurisprudence other than one law review article, *The Political Offense Exception: Reconciling the Tension Between Human Rights and International Public Order*, for the proposition that "An individual who had been granted political asylum…may subsequently be subject to extradition." *Id*. at 547, fn. 5, citing, Michelle N. Lewis, *The Political-Offense Exception: Reconciling the Tension Between Human Rights and International Public Order*, 63 Geo. Wash. L. Rev. 585, 587 (1995). This Court disagrees with the *Mironescu II* magistrate judge's reasoning and reliance on the foregoing law review article, which focuses exclusively on the political offense exception incorporated into many extradition treaties, which is not applicable here, and which likewise cites no supporting law or jurisprudence.

Mr. Porumb further distinguishes *Mironescu II* on the grounds that the court relied upon the 1924 Treaty, which has since been replaced by the 2007 Treaty

applicable to this matter. Mr. Porumb argues that the provision of the 1924 Treaty which allowed for extradition of asylum seekers was specifically deleted. (Rec. Doc. 32, at 26).[4] The Government argues that the current Treaty could have included a specific provision regarding the effect of one's asylum status. (Rec. Doc. 37, at 8). The existence of §1158(c) could explain the Treaty's silence on the issue; however, faced with two competing, yet plausible explanations, the Court makes no definitive finding on legislative intent, absent evidence or citation to supporting authority from either party.

The Government appears to concede that no precedent has held that an asylant may not be extradited under §1158(c), and instead relies on case law holding that extradition and immigration proceedings are separate and independent procedures. (See Rec. Doc. 37 at 4 - 5). The Court finds that the Government's cited cases are distinguishable and/or inapplicable. See e.g. *Fejfar v. United States*, 724 F. App'x 621, 622 (9th Cir.), *cert. denied,* 139 S. Ct. 286 (2018) (With minimal discussion, the court affirmed staying of immigration proceedings pending resolution of extradition proceedings.); *Sandhu v. Reno*, No. CIV. A. 96-1620(EGS), 1996 WL 451053, at *1 (D.D.C. Aug. 5, 1996) (holding that the court lacked jurisdiction to

---

[4]     In response, the Government argues that the phrase, "who shall seek an asylum," in the 1924 Treaty is a historical reference to fugitives in general, rather than legal status. (Rec. Doc. 37, at 7). The Court makes no finding in this regard, except to note that the phrase is absent in the 2007 Treaty.

allow the detainee an opportunity to apply for asylum once extradition had been certified and extradition proceedings begun.); *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1190 (W.D. Okla. 2015) (finding that the defendant did not have a right to commence asylum proceedings prior to extradition); *Masopust v. Fitzgerald*, No. 2:09-CV-1495-ARH, 2010 WL 324378, at *4 (W.D. Pa. Jan. 21, 2010) (deferring removal proceedings pending resolution of extradition proceedings). Each of these cases considered the effect of contemporaneously pending asylum and extradition proceedings, a situation which is not present here. The distinction is significant, because §1158(c) operates as an absolute bar to extradition of an individual who has already been granted asylum. *Pending* asylum claims do not implicate §1158(c).

Another common thread among the Government's cited cases is reliance upon the First Circuit's discussion in *Castaneda-Castillo v. Holder*, an opinion the Government also cites for the proposition that immigration and extradition proceedings should not coexist. *Castaneda-Castillo v. Holder*, 638 F.3d 354 (1st Cir. 2011). This First Circuit case is not binding on this Court. Regardless, the unique factual circumstances of that case do not warrant extending its discussion to cases such as this. In *Castaneda-Castillo*, the First Circuit held that the defendant's pending asylum claims were to be adjudicated prior to resolution of extradition proceedings. Castaneda-Castillo's asylum claims (based on his unwitting

participation in a massacre in Peru resulting in threats of revenge from the group massacred) had been pending for eighteen years and affected his wife and daughter as beneficiaries. *Id*. at 362. Contrarily, extradition proceedings had only recently commenced, and the Government did not issue the formal complaint until a year and a half after Peru's request. *Id*. at 359. In reasoning that "specific and compelling interests" weighed in favor of giving deference to the defendant's asylum proceedings, the court set forth the "separate and distinct," rationale upon which the Government and its cited cases rely. *Id*. at 360.[5] Neither the application nor the effect of §1158(c) was raised or discussed. Indeed, that provision was inapplicable, given the status of Castaneda-Castillo's asylum proceedings as pending. Thus, the First Circuit's holding should not be extended to a case such as this, where the Court must consider the effect of a previous grant of asylum on a request for extradition in light of §1158(c).

The *Castaneda-Castillo* opinion is thought-provoking insofar as it gave deference to asylum proceedings, based upon "specific and compelling interests." It is not a far leap to find that this Court's holding merely gives deference to already

---

[5] Interestingly, the Government submitted in *Castaneda-Castillo* that "when asylum and extradition 'proceedings are contemporaneous, they are related inasmuch as they both involved a determination as to whether a foreign national will be required to return to his country of nationality.'" *Id*. at 361. The Government appears to now take a contrary approach.

concluded asylum proceedings, especially when considering the "specific and compelling interests" involved. In his 2002 Declaration in Support of Application for Asylum, Mr. Porumb detailed ongoing encounters with Romanian law enforcement wherein they routinely falsely accused him of theft and attempted to elicit bribes from him. Mr. Porumb explained that in 2000, the police threatened to "get [him]" on multiple occasions. He was "terrified that the policemen were going to accuse [him] in a false case and detain [him]," and he "was afraid that the police would eventually stay true to their word and accuse [him] in a false case." (Rec. Doc. 32-1, at 13-14). Romania's conviction arises from charges which arose in 2000, the same time period in which Mr. Porumb predicted false prosecution. Probable cause for the conviction is further discussed below, but the Court emphasizes that the U.S. Government granted Mr. Porumb asylum status based on facts bearing uncanny resemblance to the facts underlying Romania's request for extradition. As such, the Court finds that specific and compelling interests support giving deference to the Government's previous grant of asylum over the currently pending extradition proceedings.

While extradition and immigration proceedings may, in the typical sense, be separate and independent procedures governed by different provisions of federal law, §1158(c) creates an exception and requires the Court to consider the effect of previously granted asylum status on any subsequent proceedings regarding removal

or return of the asylant to his country of nationality, including extradition. The Court cannot ignore one provision of the law merely because it falls under a different title. To do so would be to engage in non-inquiry of our own federal laws—a preposterous notion. In granting Mr. Porumb asylum status, the Government has already decided that Mr. Porumb is non-extraditable. Pursuant to §1158(c), this Court, like the Government here, is bound by that decision. Thus, the Court finds that the proposed extradition would violate federal law and declines to certify the extradition.

## II.  Criminality under the Treaty and Probable Cause

Although the Court finds that Mr. Porumb's extradition would violate federal law, the Court next addresses the three traditional certification inquiries of jurisdiction, criminality under the Treaty, and probable cause. Mr. Porumb does not challenge that this Court has jurisdiction or that the U.S. – Romania Treaty was in full force and effect. (Rec. Doc. 18, at 15-16).

### A.  Criminality under the Treaty.

This prong of the certification analysis requires the Court to determine whether the offense charged is an extraditable offense under the Treaty. Article 2(1) defines an offense as extraditable if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of more than one year or by a more severe penalty. (Rec. Doc. 1-3, at 27). Mr. Porumb does not challenge that the charged offenses qualify as extraditable offenses under

the Treaty. Rather, Mr. Porumb argues that the charged offenses are not extraditable because they are time-barred under Article 6 of the Treaty, which states:

> Extradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State. Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State.

(Rec. Doc. 1-3, at 29).

Whether extradition may be denied on these grounds depends upon a determination of whether prosecution or execution of the penalty would be time-barred under Romanian law. The Government urges the Court to forgo analysis of whether Romania's extradition request is time-barred, because that inquiry is for the Secretary of State. Absent binding precedent, the Court reviewed how other Circuits have resolved this issue and agrees with the Ninth Circuit's explanation of the interpretation of extradition treaty exceptions:

> Extradition treaties often provide for the general extraditability of individuals who commit offenses that are recognized as crimes in both the requesting and the requested states, subject to enumerated exceptions. These exceptions are of two general types: mandatory exceptions (including political offenses) and discretionary exceptions.[13] If an individual falls within a mandatory exception, the United States cannot extradite him to the requesting country and the magistrate may not certify him as extraditable. If an individual falls within a discretionary exception, however, the United States can choose not to extradite him to the requesting country, but it is under no obligation to the relator to do so. When requested by the United States, the magistrate must certify an individual even though he may be subject to a discretionary exception.

*Vo v. Benov*, 447 F.3d 1235, 1246 (9th Cir. 2006)

> The two types of exception[s] are characterized by different language in extradition treaties. The use of "shall" language in a treaty indicates a provision constitutes a mandatory exception….The use of "may" language in a treaty indicates a provision constitutes a discretionary exception.

*Id*. fn. 13.

In *Patterson v. Wagner*, the Ninth Circuit relied upon *Vo* in its consideration of a lapse of time exception in the U.S. – South Korea Treaty with identical language as in the U.S. – Romania Treaty. *Patterson v. Wagner*, 785 F.3d 1277, 1280 (9th Cir. 2015). The court held that the exception was discretionary, and thus a determination of whether the extradition was time-barred under the treaty was for the Secretary of State, rather than the court. *Id*. at 1283.

This Court is mindful of the prolonged and unexplained lapse of time between Mr. Porumb's Romanian conviction in October 2005 (five years after the alleged offense) (Rec. Doc. 1-2, at 1-2; 9-10), Romania's formal request for extradition which the U.S. Government did not receive until February 2012 (over six years after the conviction) (Rec. Doc. 1-2, at 32-6), and the Government's complaint to certify the extradition, which was not until January 2018 (over seven years after Romania's initial request, thirteen years after the final conviction, and eighteen years after the

alleged offense) (Rec. Doc. 1).[6] The Court is appreciative of Mr. Porumb's legal expert's opinion that the extradition is time-barred under the laws of Romania. (Rec. Doc. 32-13; 32-18). The Court is perplexed by the Romanian Government's prolonging of the underlying criminal proceedings. Nearly eighteen years after the alleged crime, thirteen years after the conviction became final, and four years after the Romanian Government requested extradition, the Romanian Court dismissed the charges against Mr. Porumb on March 28, 2018, stating: "the court considers the limitation period fulfilled for the enforcement of the 4 (four) year imprisonment," and "hereby cancels the enforcement documents…" (Rec. Doc. 32-16). Yet, the Romanian Government stated in April 12, 2018 correspondence, without any supporting documentation, that it had appealed the Romanian Court's dismissal of the charges. (Rec. Doc. 34-1). The Government has provided no further information regarding the pendency of the underlying criminal case. Notwithstanding this Court's grave concerns regarding the timeliness of Romania's extradition attempt, the Court lacks the authority to assist the Secretary in making discretionary determinations under the Treaty. See *Vo*, 447 F.3d at 1247. Hence, although the Court finds that the criminality prong is satisfied, the Court strongly urges the

---

[6] The Government asserts that Romania did not "perfect[] its request" until June 2017. (Rec. Doc. 37, at 3).

Secretary to consider the circumstances and lack of competent evidence presented herein.

**B.** **Whether the evidence warrants a finding of probable cause.**

The third inquiry in the certification analysis focuses on "whether there is any competent evidence tending to show probable cause." *Balzan v. United States*, 702 F.3d 220, 223 (5th Cir.2012) (Citations omitted.) "[A]uthenticated documents may serve as competent evidence." *Id*; 18 U.S.C. §3190. Unauthenticated documents are not competent evidence to support extradition. *In re Rojas*, 859 F. Supp. 2d 203, 206 (D. Mass. 2012). In making a probable cause determination, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239 (1983).

Article 8 of the U.S. – Romania Treaty mandates multiple documents be submitted in support of requests for extradition, including documents regarding the identity and location of the person sought, information describing the facts of the offense and procedural history, and relevant text of applicable laws, *inter alia*. (Rec. Doc. 1-3, at 30). In addition, in the case of a person who has been convicted *in absentia*, the requesting party must also include a copy of the warrant, charging document, and "such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought." (Rec. Doc.

1-3, at 30-31 – Article 8, Section 4(d), referencing Section 3). Article 11 requires that all supporting documents be translated into the language of the requested state (the United States in this case). (Rec. Doc. 1-3, at 31).

The Court has reviewed the evidence presented by the Romanian Government in support of its request for extradition, which, in addition to copies of translated laws, consists of the following:

1. Minutes of May 20, 2005 trial and May 30, 2005 ruling of the Court of Brasov, convicting Mr. Porumb of use of forged documents and swindle and sentencing him to 4 years and 1 year on the respective convictions. (Rec. Doc. 1-2, at 19-30).

2. Minutes of September 27, 2005 appellate proceedings and October 11, 2005 appeal ruling granting the Government's appeal and finding Mr. Porumb guilty, in addition to the two previous convictions, of indirect participation in use of forged document and sentencing him to an additional 1 year term of imprisonment. (Rec. Doc. 1-2, at 35-49).

3. March 27, 2003 minutes of presentation for recognition from photos in which Rusu Teodor Petru identified Mr. Porumb in a photo line-up. (Rec. Doc. 1-2, at 52-54).

4. October 29, 2001 statement of Rusu Teodor Petru and August 13, 2002 "Sequel," in which he stated that on May 11, 2000, he loaned Mr. Porumb

13200 German Marks, which Mr. Porumb guaranteed with Apartment 4.[7]
Mr. Porumb did not repay the money on the September 2000 due-date, and
in late 2000, they agreed to reduce the amount owed to 9000 German
Marks. When Mr. Porumb did not pay, Mr. Rusu obtained a declaration of
enforceability of the loan agreement. In September 2001, Liliana Porumb
advised Mr. Rusu that her husband (Mr. Porumb) had presented a false
power of attorney which had been translated by Popa Marieta. (Rec. Doc.
1-2, at 55-56).

5. October 10, 2011 and October 30, 2001 statements of Liliana Emilia
Porumb, in which she stated that she purchased Apartment 4 in November
1999. She was then out of the country from January 25, 2000 through
August 6, 2000, and again from December 9, 2000 through September 8,
2001. She later discovered that her name had been forged on a power of
attorney in Germany, though she had never been in Germany. She had not
seen Mr. Porumb since December 2000, and their divorce was
"pronounced" in October 2001. (Rec. Doc. 1-2 at 58-60).

6. September 13, 2000 "Statement" executed by Mr. Porumb and Pop
Eugenia (Liliana's mother) indicating that Pop Eugenia donated money to

---

[7]     The specific location of the property in question is set forth throughout the documents. The
Court will refer to it as "Apartment 4."

Liliana which she used to purchase an apartment, and that Mr. Porumb was aware of, but not present at the sale and "did not wish to avail [himself] of the provisions of Art. 30 of the Family Code…in what concerns the property right acquired by my wife over the…apartment." (Rec. Doc. 1-2, at 61-62).

7. June 23, 2003 Indictment, which sets forth the following pertinent statements:

> [I]n the spring of 2000, the date being not exactly known, the accused Porumb Marius Andrei appeared before the headquarters of SC Silcris lmpex SRL Brasov where he requested the translation from German of a document, according to which Porumb Liliana Emilia had agreed, before a notary public in Germany, for the accused to secure any loan, contracted by him; With the apartment In their joint ownership.

> The translation was done by Popa Marieta, authorized translator. Subsequently the accused appeared before the notary public Tudorache Viorel, on .10.05.2000, and legalized the submitted document.

> (Rec. Doc. 1-3, at 125-130).

The Romanian Government did not provide a copy of the power of attorney, the allegedly forged document which initiated the charges and which is at the heart of Romania's request. This missing evidence is critical, because the Court is unable to ascertain from the documents presented the date on which the alleged forgery occurred and whether it is probable that an actual forgery occurred. Neither did the Romanian Government provide copies of the loan agreement (the second most

important document after the power of attorney), the Brasov police's two technical and scientific findings reports purporting to show forgery, transcripts or synopses from the witness testimony at trial, or any of the several other documents identified in the Indictment. (Rec. Doc. 1-2, at 125-130).

The most the Court can glean from the evidence presented is that on some unknown date in the spring of 2000, Mr. Porumb obtained a translation of a German document whereby Liliana had agreed to secure a loan with the apartment, and that on May 5, 2000 Mr. Porumb "legalized the submitted document." The documents presented, which do not include the quintessential documents, ask the Court to assume that the alleged forgery occurred at the same time as the translation in spring of 2000, when there is no evidence before the Court supporting this fact. (Rec. Doc. 1-3, at 125). Alternatively, it could be that the Romanian forgery charges arose out of the May 5, 2000 document, but it is unclear, and, nevertheless, the Court cannot ascertain any foul play from the documents presented, which merely state that Mr. Porumb "legalized" the document. Absent the actual documents and the technical and scientific reports which the Romanian Government claims link Mr. Porumb to the forgery, it is unclear to the Court that Mr. Porumb's alleged translation of the German document amounts to forgery. The Court questions why the Romanian Government failed to provide the chief documents upon which the conviction was

based; yet, it provided a notarized document between Mr. Porumb and Liliana's mother regarding Apartment 4.

Considering the unique facts of this case, and particularly that Mr. Porumb predicted that in 2000 certain members of the Romanian Government would attempt to fabricate evidence and bring false charges against him, and that the Romanian charges arose in 2000, the Court is warranted in requiring more to show probable cause than the Romanian's Government's presentation of two statements and summaries of its own legal proceedings. The Romanian Government could have provided the allegedly forged power of attorney and loan document. It could also have provided the alleged handwriting reports, but it instead provided only the report regarding Mr. Rusu's alleged identification of Mr. Porumb, including rather odd photographs of Mr. Rusu pointing to Mr. Porumb's photo (also subject to suspicion considering Mr. Porumb's asylum affirmations regarding the Brasov police). It could have provided transcripts of the witnesses who testified at trial or who were noted to assist, but instead the Government provided only the summaries of its own legal proceedings, two statements, an insignificant identification report, and a relatively irrelevant declaration regarding the presumed separate nature of the apartment.[8] This

---

[8] It is also unclear to the Court that the notarized document between Mr. Porumb and Liliana's mother establishes that Apartment 4 was Liliana's separate property. The statement states only that Mr. Porumb was aware of Liliana's purchase of the apartment and that he did "not wish to avail [himself] of the provisions of Art. 30 of the Family

is insufficient to allow the Court to make an independent determination of probable cause. See *In re Ribaudo*, 2004 WL 213021, at *6 (S.D.N.Y. Feb. 3, 2004) (Court unable to make an independent determination of probable cause where the Italian Government presented only a summary of its legal proceedings, the arrest warrant, and relevant laws, without providing the actual evidence referred to in the court summaries.) Contrast *Jimenez v. Aristeguieta*, 311 F.2d 547, 555 (5th Cir. 1962) (Probable cause was founded upon "voluminous" documents, detailed in the opinion, indicating financial crimes.); *Matter of Extradition of Russell*, 805 F.2d 1215, 1217–18 (5th Cir. 1986) (Actual letters showing financial transgressions in the record supported a finding of probable cause.).

Because of the lack of key evidence needed for the probable cause analysis, and in light of the timing of Romania's charges, the Court concludes that the Romanian Government has not established probable cause and declines to certify the extradition on these additional grounds.

## Conclusion

For the reasons discussed herein, the Government's Motion to Certify (Rec. Doc. 11) is denied. The Court finds that the proposed extradition would violate 8

_____

Code…" The Romanian Government did not provide a translation of Art. 30 of the Family Code.

U.S.C. §1158(c)(1). The Court further finds that the Romanian Government has failed to provide sufficient information under the Treaty to provide a reasonable basis to believe that Mr. Porumb committed the offenses charged.

THUS DONE in Chambers, Lafayette, Louisiana on this 25th day of September, 2019.

_____
PATRICK J. HANNA
U.S. MAGISTRATE JUDGE